UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOEL GRAY,

                  Petitioner,

  -vs-

TIM MURRAY, SUPERINTENDENT,
GOWANDA CORRECTIONAL FACILITY

                  Respondent.
_____

**DECISION AND ORDER**
**No. 06-CV-6257T**

## I.  Introduction

Petitioner, Joel Gray ("Petitioner"), proceeding, through counsel,[1] has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered December 15, 2003, in New York State, County Court, Steuben County, convicting him, after a jury trial, of Rape in the First Degree (N.Y. Penal Law ("Penal Law") § 130.35[1]) and Rape in the Second Degree (Penal Law § 130.30[1]).

For the reasons stated below, the writ is denied and the petition is dismissed.

---

[1] Petitioner, in a letter dated August 18, 2009, requested that counsel be appointed. See Docket No. 21 ("Motion to Appoint Counsel by Joel Gray"). That request is denied by this Decision and Order because Petitioner is currently represented by counsel. See Docket Nos. 3 and 5 ("Notices of Appearance by Michael P. Kushner, Esq. and Lorilee Gates, Esq.).

-1-

## II. Factual Background and Procedural History

### A. Introduction

On July 15, 2002, the 13 year-old victim,[2] was spending an overnight visit at the apartment that her mother shared with Petitioner in Bath, New York. After her mother fell asleep, Petitioner pushed the victim down, put his hand over her mouth, removed her underpants, and raped her.

By Steuben County Indictment Number 2002-308, Petitioner was charged with Rape in the First Degree and Rape in the Second Degree.

### B. The Trial

#### 1. The People's Case

On the night of July 15, 2002, the victim, a borderline mentally retarded girl then age 13, and in foster care, had a sleep-over at the apartment of her biological mother ("the mother" or "the victim's mother") in Bath, New York.[3] Trial Transcript [T.T.] 51-54, 83-84, 98. The victim's mother shared her apartment with Petitioner. Before the night of the incident, the victim had only met Petitioner a couple of times, and they did not get along. T.T. 54. After dinner that evening, the victim played cards with

---

[2] The minor victim's name and identifying information is withheld from this Decision and Order.

[3] Prior to this incident, the victim had been placed in foster care because her mother had a history of alcohol and drug abuse, and had previously been convicted and imprisoned for selling crack cocaine. T.T. 85. The victim was permitted to visit her mother, unsupervised, on occasion. T.T. 153.

her mother and Petitioner before going to bed.  T.T. 55.  The victim was to sleep with her mother in the first floor living room, while Petitioner was to sleep in the second floor bedroom that he usually shared with the victim's mother.  T.T. 56.

After her mother went to bed, Petitioner came into the living room.  T.T. 58, 98.  The victim tried to wake her mother without success.  T.T. 58.  Petitioner took the victim by the arm and led her into the upstairs bedroom where he then pushed her down onto her mother's bed.  T.T. 59-60.  Petitioner got into the bed, removed the victim's shirt and underpants, got on top of her, touched her personal areas, and then inserted his penis inside her vagina.  T.T. 61-62.  The victim did not know if Petitioner wore a condom because it was dark.  T.T. 60.  The victim tried to push Petitioner off of her, but he was too strong.  The victim tried to yell out, but Petitioner put his hand over her mouth.  T.T. 62.  Because she was scared, the victim waited until the next morning to tell her mother that she had been raped.  T.T. 64-65.  Before that night, the victim had not yet had her first period.  T.T. 105-106.

The victim testified that she sustained no physical injuries from the incident, and that after she spoke to her mother the next day, her mother did not call the police or take her to see a doctor.  T.T. 77.  The victim also testified that she told no one else about the incident, except for her foster mother who took her to see a doctor the following day.  The doctor performed a pubic

examination of the victim and collected a Rape Kit. T.T. 77-78. The results of the examination were inconclusive as to whether the victim had been raped.[4] T.T. 50. The victim also testified that she disliked all her mother's previous boyfriends before Petitioner. T.T. 68.

The victim's mother corroborated the victim's testimony about the sleeping arrangements during the victim's visit. T.T. 101. She testified that she went to bed after the television news, and woke up around 2 a.m. to find that neither the victim, nor her pillow, were in the living room. At that time, Petitioner was walking up the stairs to his bedroom and the victim was in the bathroom. T.T. 104. Thereafter, the victim's mother discovered the victim's pillow on top of Petitioner's bed in his bedroom. T.T. 106. Petitioner indicated to the victim's mother that the victim had come into his bedroom to talk to him about her period. T.T. 107. When the victim exited the bathroom, the victim's mother testified that she did not see any blood in the toilet and she did not speak to the victim. T.T. 105, 107, 124-125. The victim showered the following morning. T.T. 96-97, 110.

On cross-examination, the victim's mother testified that the victim did not like Petitioner because she thought he was going to try to take the place of her deceased father. T.T. 119.

---

[4] Human blood was found on the underwear and shirt of the victim. T.T. 46-47, 102-103.

Investigator David DuBois ("DuBois") of the Bath Police Department testified that if a victim showers, and if a condom is used, evidence that could corroborate a sexual assault is lost. T.T. 128-129. DuBois learned of the rape allegation shortly after July 18, 2002, but did not visit the victim's mother's home until July 29, 2002. T.T. 129. At that time, he did not collect any physical evidence from the home. T.T. 143. DuBois interviewed Petitioner on August 1, 2002 at the Bath police station. Petitioner came into the station voluntarily. T.T. 132. After being administered his <u>Miranda</u> warnings, Petitioner told DuBois that he had observed the victim going back and forth into the bathroom on the night of the alleged incident, and that she had come into his room to tell him she got her period. T.T. 139. Petitioner did not admit to raping the victim. T.T. 141-142.

**2.   Petitioner's Case**

Petitioner attempted to call a sister of the victim and the victim's former foster parent as character witnesses, but these individuals were precluded from testifying because the trial court determined their testimony was not relevant to whether Petitioner raped the victim. T.T. 149-150, 155-156.

A different sister of the victim testified that both she and the victim were permitted to spend limited time at their mother's

home, and that her relationship with her mother was rocky because the victim wanted all of her mother's attention.[5]  T.T. 153-154.

Petitioner also intended to call one additional witness to testify to the victim's prior history of sexual misconduct, but this individual was prevented from being called based on the trial court's determination that such testimony was not a permissible basis for calling a witness.[6]  T.T. 157-158.

Petitioner testified that he did not rape the victim. T.T. 164, 180.  He testified that, on the night in question, he played cards with the victim and her mother, and then went upstairs to his room.  T.T. 164.  He testified that later that night, the victim appeared in his bedroom with an aerosol can of hair spray and her pillow, complaining that her mother had gas.  T.T. 167-168. Petitioner testified that he told the victim to go to bed because it was late, and that she got angry and quickly left the room, leaving the pillow and aerosol can behind.  T.T. 168-169. Thereafter, Petitioner testified that he read his bible, helped a drunk neighbor get into his home next door, came back inside the victim's mother's home, spoke briefly with the victim's mother, and then went to bed.  T.T. 170.  He testified that when he got up to

---

[5]  Upon objection from the prosecution, the trial court instructed the jury to disregard the portion of this testimony related to the victim wanting all of her mother's attention.  T.T. 154.

[6]  Pursuant to New York's Rape Shield Law (New York Criminal Procedural Law § 60.42(5)), evidence of a victim's sexual conduct is not admissible in a rape prosecution unless such evidence is determined by the court to be relevant and admissible in the interest of justice.

go to work the next morning, the pillow and aerosol can were gone from his room. T.T. 172.

Petitioner denied telling Investigator DuBois that the victim had come into his bedroom to talk to him about her period, testifying he had no idea where that statement had come from. T.T. 197-198.

### 3. Verdict and Sentencing

On October 23, 2003, Petitioner was found guilty as charged and sentenced to a determinate sentence of nine years, followed by five years post-release supervision on the first degree rape count, to be served concurrently with a determinate term of one to three years on the second degree rape count.

### C. Direct Appeal

Petitioner appealed his judgment of conviction to the Appellate Division, Fourth Department, which was unanimously affirmed on February 4, 2005. People v. Gray, 15 A.D.3d 889 (4th Dep't. 2005). Leave to appeal to the New York State Court of Appeals was denied. People v. Gray, 4 N.Y.3d 831 (2005).

### D. The Habeas Corpus Petition

Petitioner filed the habeas corpus petition presently before this Court, wherein he seeks relief on the ground that he was denied effective assistance of trial counsel.

**III. General Principles Applicable to Habeas Review**

    **A.   The AEDPA Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413; see also id. at 408-10. "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001). Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable." Id. This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the

state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

**B. Exhaustion Requirement**

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*), cert. denied, 464 U.S. 1048 (1984).

**IV. Petitioner's Claim**

Petitioner argues that he was denied his Sixth Amendment right to effective assistance of trial counsel because "counsel prepared and proceeded upon an illegal, non-existent defense." Petition [Pet.], 4; Traverse [Trav.], 3.[7] Specifically, Petitioner claims that counsel was "obviously and inexcusably unaware of the New York Rape Shield Law" which prevented the introduction of certain evidence related to the victim's past sexual misconduct. Further,

---

[7] Per Petitioner's request, the Court will review this claim and only this claim exactly as he has stated it in his Traverse, and not as four separate claims, as Respondent did in its Memorandum of Law. See Trav., 3.

Petitioner contends that had he known before his trial that counsel was an inexperienced trial attorney and that her proposed theory of defense would not be viable at trial, he would have elected to enter a guilty plea instead. Trav., 4, 6-7. Petitioner raised this claim on direct appeal to the Appellate Division, Fourth Department, and the claim was rejected on the merits. Gray, 15 A.D.3d at 890. The claim is exhausted and properly before this Court, but lacks merit.

It is well-settled law that a petitioner claiming ineffective assistance of counsel must show that counsel's representation was fundamentally defective, and that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. See Strickland v. Washington, 466 U.S. 668 (1984); Aparicio, 269 F.3d at 95. A petitioner seeking to establish constitutionally ineffective assistance of counsel must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)); see also, e.g., United States v. Jones, 918 F.2d 9, 11 (2d Cir. 1990) (holding that counsel's decisions should not be evaluated in hindsight). Moreover, the decision to pursue a particular defense, or to call a particular witness, is a tactical decision to be made by counsel. United

States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987). And, of course, counsel is "strongly presumed to have rendered adequate assistance and [to have] made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 689-90.

Petitioner contends he was denied effective assistance of counsel because his attorney chose to pursue a losing theory of defense. This claim lacks merit. At the outset, the court notes that the examples of error cited by Petitioner to support the allegation that counsel pursued and proceeded upon a losing defense (e.g., her inarticulate opening statement, her ineffective cross-examination, her poor closing argument) fall squarely within the ambit of trial strategy decisions, and, if reasonably made, will not constitute a basis for an ineffective assistance claim. See e.g., Nersesian, 824 F.2d 1294 at 1321 (citing cases). In this particular circumstance, Petitioner has failed to overcome the presumption that counsel's tactical decisions related to the defense she chose to pursue and proceed upon falls within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689-90.

Indeed, the trial court did preclude the introduction of certain testimonial and documentary evidence related to the victim's past sexual conduct pursuant to New York's Rape Shield Law. However, such preclusion did not, as Petitioner rather

contends, "derail" her entire case or leave her in a compromising position such that she could not effectively advocate on Petitioner's behalf.[8]  Pet., 4.  Rather, the record reflects that counsel tried the case from start to finish consistent with the theory that Petitioner was innocent, that there was no physical evidence to prove he committed the crime, and that the victim had fabricated the story she was raped because she did not like Petitioner and longed for her mother's attention.

The record shows that counsel delivered an effective opening statement, wherein she articulated the defense theory that Petitioner had been falsely accused, and emphasized that the evidence would show that no rape occurred.  T.T. 45-50.  Notably, in this opening statement, counsel analogized Petitioner's case to an unrelated case from California where various adult daycare workers had been accused by children of similar predatory acts, and the accusations turned out to be false.  Counsel emphasized how lies and false accusations -- much like the ones in Petitioner's case -- can irreparably shatter the life of an individual.  T.T. 48.

The record also shows that through cross-examination of the People's witnesses during the trial, counsel brought out the following salient points that were consistent with her theory that

---

[8] Petitioner explains that: "this situation is exactly as it looks - trial counsel made a grievous error, got caught, had no back-up plan and no experience to draw upon and went down in flames."  Pet., 6.

-13-

Petitioner was innocent and that the victim was not credible: that the victim was diagnosed with conduct disorder and attention deficit hyperactivity disorder; that the victim had mood swings and anger outbursts, such that her own mother was scared of her; that the victim was argumentative and had a habit of invading people's personal spaces; that the victim was medicated with a mood stabilizer as a result of her inability to gauge people's personal spaces; that the victim was the subject of a behavior modification plan; that the victim disliked Petitioner because she feared he would take the place of her deceased father; that the victim disliked all of her mother's past boyfriends; and that the victim's sister felt that the victim occupied all of her mother's time and attention. T.T. 87-91, 110, 120-121, 177-178. Regarding the lack of physical evidence in the case, counsel elicited the following pertinent information on cross-examination of the People's witnesses: that the victim did not get hurt or sustain bruises from the alleged rape; that the victim told no one except her mother about the alleged rape; that the victim's own mother did not even call the police in response to the victim's allegation that she was raped; and that DuBois waited eleven days to visit the alleged crime scene and then collected no evidence at all, let alone evidence of a rape. T.T. 75, 78, 142-143.

Furthermore, the record reflects that counsel's direct examination of Petitioner elicited the following information that

was also consistent with her theory that Petitioner was an innocent man who had been falsely accused: that Petitioner was community-oriented and took part in volunteer work such as caring for the elderly; that he was an active member of his church and participated in bible study; that he believed strongly in family values and that it was wrong to violate a child; and that he did not rape the victim.  T.T. 159, 164, 180.

Finally, the record shows counsel delivered a well-reasoned and articulate closing statement in which she summarized the testimony heard and the lack of physical evidence in the case, and re-emphasized Petitioner's steadfast position that he was innocent of the heinous crime with which he was charged.  Counsel urged the jury to reject the victim's testimony, arguing that the victim had not told her story in a believable, narrative form, but had simply responded to a series of leading questions posed to her by the prosecutor.  Additionally, counsel reminded the jury of the presumption of innocence and that they should find Petitioner not guilty if there is a reasonable doubt as to his guilt.  Viewed as whole, counsel's closing statement was powerful and persuasive, focusing the jury's attention on the gravity of the offense and urging it not to convict Petitioner of a crime he simply did not commit.  T.T. 205-209.

Accordingly, Petitioner has failed to meet the reasonableness prong of <u>Strickand</u> by showing that counsel's choice of defense

theories -- and the strategic choices she made throughout the trial related thereto -- fell outside the wide range of professional assistance. Petitioner has also failed to meet the prejudice prong of Strickland. He contends, unconvincingly, that as a result of counsel's alleged errors, he "reject[ed] what was a very good plea offer and instead proceed[ed] to trial where he lost quite miserably." Trav., 5. This contention, which is conveniently made with the benefit of hindsight, amounts to nothing more than an after-the-fact expression of dissatisfaction with his decision to proceed to trial. The record shows that Petitioner discussed the plea arrangement[9] with his attorney before trial and rejected it knowing that, in doing so, he ran the risk of being convicted of rape and sentenced to up to twenty-five years in prison.

Accordingly, the Court cannot find that the state court's determination of this issue was "contrary to" or "an unreasonable application of" settled Supreme Court law.

---

[9] Before trial, the People agreed to resolve the matter by a plea of guilty to either one count of rape in the second degree or attempted sexual abuse in the first degree in full satisfaction of all charges, which would carry a sentence of not more than six months in prison and ten years probation. The record reflects that Petitioner discussed the terms of the proposed plea with his attorney, and rejected the offer. The prosecutor stated, on the record, that if Petitioner chose to go to trial and was convicted, the sentence range would be between five and twenty-five years imprisonment. T.T. 3. Although this plea arrangement was not reduced to writing, defense counsel stated, on the record, that she had discussed this offer with her client and "he has decided to proceed and go ahead with the . . . trial starting tomorrow." T.T. 4.

**V.   Conclusion**

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I decline to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca
_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:   December 4, 2009
         Rochester, New York